```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------X
                                   x   MDL Docket No. 1500 (SWK)
In re AOL TIME WARNER, INC.        x      Master File No.
SECURITIES LITIGATION              x     06 Civ. 0695 (SWK)
                                   x
-----------------------------------x
This Document Relates To:          x   OPINION AND ORDER
                                   x
THE CONSOLIDATED OPT-OUT ACTION    x
-----------------------------------X
```

**SHIRLEY WOHL KRAM, U.S.D.J.**

On September 30, 2005, the Court certified a class for the settlement of securities fraud claims arising out of the merger of America Online, Inc. ("AOL") and Time Warner, Inc. ("Time Warner") into AOL Time Warner, Inc. ("AOLTW").[1] Following certification, a number of parties opted out of the class and filed individual actions throughout the country. Those actions were transferred to this Court by the Judicial Panel on Multidistrict Litigation (the "JPML"). The Court then consolidated for all pretrial purposes the actions of approximately 200 opt-out plaintiffs that had retained common counsel. On May 9, 2007, pursuant to a settlement agreement, these plaintiffs voluntarily dismissed their claims as to all

---

[1] Although the merged entity has since changed its name from AOLTW to Time Warner, Inc., for clarity, the Court will continue to refer to that entity as AOLTW. AOLTW and affiliated defendants filed a separate motion to dismiss prior to the voluntary dismissal of this action against them. That group of defendants will be referred to throughout this Opinion as the "AOLTW Defendants."

defendants except Ernst & Young LLP ("E & Y"). Now before the Court is E & Y's motion under Federal Rule of Civil Procedure 12(b)(6) to partially dismiss the consolidated opt-out action. For the following reasons, the action is dismissed in part.

## I.    BACKGROUND

In April 2006, the Court approved the settlement of securities class action litigation arising out of AOL and Time Warner's January 2001 merger. The above-captioned litigation consolidates nearly three-dozen actions filed by approximately 200 parties opting out of that litigation. Familiarity with the general context of the securities class action litigation, and the allegations of misconduct underlying that litigation, is presumed. See, e.g., In re AOL Time Warner, Inc. Sec. & "ERISA" Litig. ("In re AOL Time Warner I"), 381 F. Supp. 2d 192 (S.D.N.Y. 2004) (partially granting motion to dismiss in the securities class action litigation); In re AOL Time Warner, Inc. Sec. & "ERISA" Litig. ("In re AOL Time Warner II"), No. MDL 1500, 02 Civ. 5575 (SWK), 2006 WL 903236 (S.D.N.Y. Apr. 6, 2006) (approving settlement of that litigation). As E & Y is the sole remaining defendant in the consolidated opt-out action, the Court will limit its discussion to those allegations specific to E & Y or pertinent to its alleged misconduct. The Court takes

the allegations of the Complaint as true for the purpose of this motion.[2]

E & Y served as AOL's independent auditor for the fiscal years ended June 30, 1998, 1999, and 2000. The accounting firm then served in that same role for AOLTW following the merger, auditing AOLTW's 2001 financial statement. The plaintiffs contend that E & Y falsely certified that AOL and AOLTW's financial statements during this period fairly presented their "financial condition and results of operation" in conformity with Generally Accepted Accounting Procedures ("GAAP"), and that those financial statements were audited in accordance with Generally Accepted Auditing Standards ("GAAS"). (Compl. ¶ 292.) The plaintiffs allege that E & Y's conduct violated Sections 11 and 15 of the Securities Act of 1933 (the "1933 Act"), Sections 10(b), 20(a), and 14(a) of the Securities Exchange Act of 1934 (the "1934 Act"), various rules promulgated thereunder, and assorted state laws in the jurisdictions in which each of the

---

[2] This consolidated litigation includes nearly three-dozen individual complaints. Each of these complaints is identical, with the exception of the plaintiffs listed therein and the state law claims asserted. Therefore, although references to the "Complaint" throughout this opinion relate specifically to the amended complaint filed in member case Northwestern Mutual Life Foundation, Inc. v. AOL Time Warner Inc., No. 06 Civ. 2193 (SWK), the Court's analysis with respect to that document applies to all of the complaints filed as part of the consolidated opt-out action.

individual actions was filed. E & Y now moves under Federal Rule of Civil Procedure 12(b)(6) to partially dismiss these claims.

## II.   DISCUSSION

The Supreme Court recently clarified that the touchstone for a well-pleaded complaint under Federal Rules of Civil Procedure 8(a) and 12(b)(6) is plausibility. Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1968, 1974 (2007).[3] "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Id. at 1964-65

---

[3] Prior to Bell Atlantic, the Second Circuit commonly cited to the now-disapproved pleading standard enunciated in Conley v. Gibson, 355 U.S. 41, 45-46 (1957) ("[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."). See, e.g., Shah v. Meeker, 435 F.3d 244, 246 (2d Cir. 2006); Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1127 (2d Cir. 1994); In re Time Warner Inc. Sec. Litig., 9 F.3d 259, 263 (2d Cir. 1993). The practical effect of Bell Atlantic on cases outside the specific context of that antitrust case is sure to generate significant discussion in the courts. Indeed, the Second Circuit has recently asserted that, although "the Court is not requiring a universal standard of heightened fact pleading," it is "requiring a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim plausible." Iqbal v. Hasty, ___ F.3d ____, 2007 WL 1717803, at *11 (2d Cir. June 14, 2007). Here, the Court does not pass upon whether such amplification is required, as the Complaint, where deficient, is equally so under the pleading regime in effect prior to Bell Atlantic.

(citations, quotation marks, and alterations omitted). The factual allegations of a complaint "must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Id. at 1965 (citations omitted). However, "[a]sking for plausible grounds to infer [a violation of the securities laws] does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of [the violation]." Id. at 1969.

When considering a motion to dismiss, the "court must limit itself to facts stated in the complaint or in documents attached to the complaint as exhibits or incorporated in the complaint by reference." Kramer v. Time Warner Inc., 937 F.2d 767, 773 (2d Cir. 1991); see also San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos., 75 F.3d 801, 808-09 (2d Cir. 1996) (holding that documents "integral" to the complaint are properly considered on a motion to dismiss). In addition, "[o]n a motion to dismiss a securities action, a district court may consider documents required to be publicly filed with the S.E.C. that bear on the adequacy of disclosure." City of Sterling Heights Police & Fire Ret. Sys. v. Abbey Nat'l, PLC, 423 F. Supp. 2d 348, 354 (S.D.N.Y. 2006) (citing Kramer, 937 F.2d at 773-74). Accordingly, the Court considers the allegations of the

Complaint, documents incorporated therein, and any publicly filed documents appended to E & Y's motion to dismiss.

**A. The Plaintiffs' State Law Claims Are Preempted by SLUSA**

E & Y argues that the plaintiffs' state law claims should be dismissed in their entirety. Because the plaintiffs' state law claims are expressly preempted by the plain language of the Securities Litigation Uniform Standards Act of 1998 ("SLUSA"), the Court grants E & Y's motion to dismiss those claims as preempted by federal law. The Court declines to consider the defendant's alternative argument that those claims must also be dismissed as time-barred.

SLUSA sets in place certain limitations on class actions and other "mass actions" that attempt to evade the Act. S. Rep. No. 105-182, at 7 (1998). Accordingly, SLUSA's preemptive scope explicitly reaches "any group of lawsuits filed in or pending in the same court and involving common questions of law or fact, in which--(I) damages are sought on behalf of more than 50 persons; and (II) the lawsuits are joined, consolidated, or otherwise proceed as a single action for any purpose." 15 U.S.C. § 78bb(f)(5)(B)(ii).[4] In this respect, SLUSA mandates that no such

---

[4] SLUSA amends the 1933 Act and the 1934 Act "in substantially identical ways." Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit, 547 U.S. 71, 126 S. Ct. 1503, 1511 n.6 (2006). Thus, for brevity's sake, the Court's citations to relevant SLUSA provisions will be limited to the language amending the 1934 Act, codified at 15 U.S.C. § 78bb.

"action based upon the statutory or common law of any State or subdivision thereof may be maintained in any State or Federal court by any private party alleging . . . a misrepresentation or omission of a material fact in connection with the purchase or sale of a covered security." 15 U.S.C. § 78bb(f)(1). Applied to the facts here, SLUSA clearly preempts the plaintiffs' state law claims.

This litigation involves nearly three-dozen complaints filed throughout the country on behalf of over 200 individual plaintiffs. The actions were transferred to this Court by the JPML. By the time venue was established here, all plaintiffs were represented by the same law firm--Lerach Coughlin Stoia Geller Rudman & Robbins LLP. Shortly after the actions were transferred, the plaintiffs joined together in filing a single opposition to the AOLTW Defendants' motion to lift the discovery stay in this litigation. The Court then formally recognized the plaintiffs' joint litigating status, consolidating these actions for all pretrial purposes. The amended complaints in these actions are identical, with the exception of those paragraphs identifying the plaintiffs and asserting various state law claims specific to the state in which each action was filed. The plaintiffs have invariably filed all motion papers pertaining to this litigation as a group, including a recently filed motion for leave to amend all of the complaints. That motion was

accompanied by a single proposed second amended complaint, which mirrors the amendments sought for every complaint in the group. The plaintiffs' joint prosecution of this group of lawsuits on behalf of well over fifty persons has brought them squarely within SLUSA's definition of a "covered class action." 15 U.S.C. § 78bb(f)(5)(B)(ii). Thus, to the extent that these lawsuits are "based upon the statutory or common law of any State" they are expressly preempted by federal law, and the relevant state law claims must be dismissed. 15 U.S.C. § 78bb(f)(1).

The plaintiffs attempt to avoid the plain language of SLUSA by arguing "that none of the individual actions bring state law claims from any one state for more than 50 people." (Pls.' Opp'n to AOLTW Defs. 32.) Of course, this observation ignores the fact that the "individual actions," once aggregated per SLUSA's instructions, are a "covered class action" for purpose of SLUSA and are properly subject to the Act's limitations on mass actions. Ultimately, the plaintiffs cannot reap the considerable benefits flowing from the joint prosecution of their claims, yet "through artful pleading . . . avoid the clear precepts of SLUSA and its preemption of state law securities claims for damages." In re Worldcom Sec. Litig., 308 F. Supp. 2d 236, 244 (S.D.N.Y. 2004). Because theirs is a covered class action alleging claims "based upon the statutory or common law of any State," the plaintiffs' state law claims may not be maintained.

**B. The Claims Seeking Damages for AOL Shares Are Dismissed**

E & Y joins an argument posed by the recently-dismissed AOLTW Defendants that the plaintiffs may not recover for damages sustained on pre-merger AOL stock exchanged for shares of AOLTW at the time of the merger. They argue that any alleged misstatements made prior to the merger could not have been material to AOL shareholders because the plaintiffs' theory of the case posits that pre-merger AOL shareholders "actually benefited from the merger by exchanging allegedly highly inflated shares for less but still-highly inflated shares of the combined AOLTW merged entity." (AOLTW Defs.' Br. 5.) In response, the plaintiffs focus solely on alleged misstatements by the AOLTW Defendants that trumpet the potential benefits of the combined company, arguing that the AOLTW Defendants are liable to AOL shareholders because of the forward-looking nature of that class of statements. Without passing judgment on the validity of that argument, which is only applicable to the AOLTW Defendants, the Court concludes that the plaintiffs fail to identify any alleged misstatements by E & Y that would have been material to pre-merger AOL shareholders, and thus dismisses all claims against E & Y to the extent that they are premised on pre-merger AOL shares exchanged in the merger for shares of the combined company.

Pre-merger AOL shareholders seek damages resulting from a decrease in the value of AOLTW shares they received under the merger in exchange for AOL shares. Under these circumstances, an alleged misstatement is not material where knowledge of the truth "would not have made a reasonable shareholder any less likely to favor the objected-to transaction." Minzer v. Keegan, 218 F.3d 144, 149 (2d Cir. 2000). Minzer employed this definition of materiality in the context of a challenged proxy statement, in which claims are based on a discrete transaction, rather than in the broader investment context, in which claims may lie for shares purchased over a span of time. However, it is also appropriate in the context of the pre-merger AOL shareholders seeking damages here, because the exchange of AOL stock for AOLTW shares in the merger is the discrete transaction allowing those shareholders to bring claims under the securities laws.[5] Thus, the only relevant inquiry is whether *pre-merger*

---

[5] The plaintiffs allege violations of Section 11 of the 1933 Act and Sections 10(b) and 14(a) of the 1934 Act. Section 11 liability is premised on the issuance of a registration statement; here, the merger registration statement. Section 14(a) liability is premised on the issuance of a proxy statement; here, the request for proxies pursuant to the merger. Finally, Section 10(b) liability requires the purchase or sale of a security; here, the AOLTW shares received in exchange for AOL shares.

The plaintiffs also allege violations of Section 15 of the 1933 Act and Section 20(a) of the 1934 Act, but these control person claims require a primary violation, and must be dismissed if plaintiffs fail to adequately plead the underlying violations rejected here. Furthermore, the Court concludes that the Section

misrepresentations were material to AOL shareholders' decisions to vote for the merger and exchange their AOL shares for AOLTW shares. Indeed, this definition of materiality has recently been employed to evaluate Section 11 claims based on a similar share exchange in connection with a merger. See In re McKesson HBOC, Inc. Sec. Litig., 126 F. Supp. 2d 1248, 1259-61 (N.D. Cal. 2000).

The Complaint specifically alleges that the AOLTW merger was initiated by AOL in order "to take advantage of the apparent success and fabulous growth prospects of AOL . . . so that the real assets and proven earning power of [Time Warner] would cushion the coming downturn in AOL's business that they knew was likely inevitable and already beginning to occur." (Compl. ¶ 11; see also Compl. ¶ 75.)[6] In other words, the plaintiffs allege that AOL, aided by E & Y's false audit opinions, merged with Time Warner in anticipation of an inevitable downturn in AOL's stock price. Just as in In re McKesson HBOC, the alleged

---

15 and Section 20(a) claims must be dismissed in their entirety on other grounds. See infra Part II.C.

[6] The plaintiffs also emphasize that "*Time Warner shareholders* approved AOL's acquisition" as a result of E & Y's "certification and/or review and approval of AOL's financial results" (Compl. ¶ 22 (emphasis added)), indicating that Time Warner shareholders were the party aggrieved by the merger. Reinforcing this point, the plaintiffs allege: "This merger was anything but fair to *Time Warner shareholders* and the merger would wipe out billions of dollars in *Time Warner value*." (Compl. ¶ 122 (emphasis added)). The Complaint contains no similar allegations with respect to the harm suffered by AOL shareholders in connection with the merger transaction.

misstatements or omissions prior to the merger "cannot be material if [their] correction or disclosure would only redouble [pre-merger AOL shareholders'] resolve to enter into the proposed transaction." 126 F. Supp. 2d at 1260. If the true facts about AOL had been disclosed prior to the merger, AOL shareholders would be faced with a decision to either approve the merger, and receive less-inflated AOLTW shares in exchange for devalued AOL shares, or sell their AOL shares without the benefit of the "cushion" that the merger with Time Warner would provide the purportedly struggling AOL. There can be little doubt that AOL shareholders would have remained in favor of the merger had they known that the transaction would insulate losses that the plaintiffs allege they would otherwise inevitably realize. See id. at 1261. Thus, because the plaintiffs' allegations support the conclusion that E & Y's allegedly false audit opinions were immaterial to pre-merger AOL shareholders, all claims are dismissed to the extent they are premised on pre-merger AOL shares.

### C. The Control Person Claims Are Dismissed

Both Section 20(a) of the 1934 Act and Section 15 of the 1933 Act create secondary liability for persons who control primary violators of the provisions of those Acts. Courts in this District routinely examine Section 15 claims under the standard applied to Section 20(a) claims. See DeMaria v.

Andersen, 153 F. Supp. 2d 300, 314 (S.D.N.Y. 2001), aff'd 318 F.3d 170 (2d Cir. 2003); In re Am. Bank Note Holographics, Inc. Sec. Litig., 93 F. Supp. 2d 424, 441 (S.D.N.Y. 2000). As a basic matter of pleading these claims, plaintiffs must allege both an underlying primary violation and the defendant's control over a primary violator. See Boguslavsky v. Kaplan, 159 F.3d 715, 720 (2d Cir. 1998) (citing Sec. & Exch. Comm'n v. First Jersey Sec., Inc., 101 F.3d 1450, 1472 (2d Cir. 1996)). Because the plaintiffs fail to allege that E & Y controlled a primary violator, the control person claims must be dismissed.

In an effort to maintain these claims, the plaintiffs rely on In re Parmalat Securities Litigation, wherein Judge Kaplan commented: "Although a defendant ultimately may not be held liable as both a primary violator and a controlling person, such alternative theories of liability" may be permissible. 375 F. Supp. 2d 278, 310 (S.D.N.Y. 2005). In that case, the plaintiffs asserted that a corporate defendant controlled its affiliates, which were also alleged to be primary violators, in addition to alleging that the corporate defendant itself was a primary violator. Therefore, even if the corporate defendant was relieved of responsibility as a primary violator, sufficient allegations remained to find that defendant liable for its control of the other alleged primary violators.

Here, however, the plaintiffs premise E & Y's control person liability on the auditor's control over "its *own personnel*." (Pls.' Opp'n to E & Y 34.) Yet the plaintiffs do not allege that any specific E & Y personnel are primary violators, nor do they allege that E & Y controlled any of the parties who were previously identified as primary violators in this litigation. Indeed, E & Y is the sole remaining defendant in the consolidated action. To plead that a defendant's own unnamed personnel are primary violators for purposes of that defendant's control person liability, when implicitly premising the defendant's primary liability on those same personnel, collapses the distinction between primary and secondary liability. Put another way, the plaintiffs' argument amounts to little more than an allegation that E & Y controlled itself as a primary violator. Such allegations are insufficient to allege control person liability; thus, the Section 15 and Section 20(a) claims are dismissed.

**D. The Section 11 Claim Is Dismissed in Part**

In considering E & Y's motion to dismiss during the class action litigation, the Court addressed the "potential scope" of E & Y's Section 11 liability for the AOLTW Merger Registration Statement ("MRS"):

> Because Section 11 imposes liability on an auditor
> only for material misstatements or omissions in an
> audit report that is included in an SEC registration

statement with the auditor's consent, the [audit
opinion for AOL's 6/30/99 financial results (the
"6/30/99 AOL Opinion")] is the only allegedly
misleading E & Y Report which can form the basis of
Section 11 liability. Therefore E & Y's exposure under
[the Section 11 claim for the MRS] is limited to
material misstatements or omissions in the 6/30/99 AOL
Opinion.

In re AOL Time Warner I, 381 F. Supp. 2d at 236. The plaintiffs

now ask the Court to revisit that ruling. To the extent that the

plaintiffs present allegations not previously considered by the

Court, the Court finds their arguments in favor of wider

liability for this claim unpersuasive, as discussed below.

Therefore, the Court grants E & Y's motion to dismiss the

plaintiffs' Section 11 claim based on the MRS insofar as it is

premised on anything other than the 6/30/99 AOL Opinion.

First, the plaintiffs argue that E & Y is liable for its

audit of AOLTW's consolidated balance sheet as of 3/31/00, which

was included in an amendment to the MRS on May 19, 2000 (the

"May 19 Amendment"). E & Y does not dispute the existence of the

audit, but has provided a copy of the balance sheet from the May

19 Amendment, showing that AOLTW--still a shell corporation in

the first quarter of 2000, prior to the consummation of the

merger in January 2001--had assets and liabilities of $0. (Kudon

Decl. Ex. 2.)[7] The plaintiffs do not, and cannot, allege that

---

[7] The plaintiffs also attached a copy of the May 19 Amendment to
their opposition brief, but their exhibit inexplicably

this audit of the shell corporation's empty balance sheet was misleading, and they produce no other evidence of audited financial data for the first quarter of 2000 that was included in the MRS or the May 19 Amendment.[8]

Second, the plaintiffs argue that E & Y is liable for unaudited quarterly results incorporated into the MRS because E & Y consented to be referred to as an expert in that filing. The plaintiffs argue that E & Y was aware the quarterly results were not in conformity with GAAP, and thus E & Y had a duty to insist on appropriate revision of those results. Yet liability only attaches to an auditor for its certified audit opinions. The incorporation of unaudited quarterly results into the MRS does not create an independent duty of revision. See Lattanzio v. Deloitte & Touche LLP, 476 F.3d 147, 154-56 (2d Cir. 2007).

Lastly, the plaintiffs argue that E & Y is liable for the 6/30/98 audit opinion, which was included in the MRS. While the plaintiffs allege generally that the 6/30/98 opinion was falsely certified (Compl. ¶ 305), the specific allegations of the Complaint fail to support an inference that the year-end results

_____

terminates prematurely, one page before the audited AOLTW balance sheet referenced here. (Pls.' Opp'n to E & Y Ex. 1.)

[8] E & Y also provided a copy of the merged entity's *unaudited* pro forma consolidated financial data, which the company included in the May 19 Amendment along with the audited balance sheet for the shell corporation. (Kudon Decl. Ex. 1.) Of course, this unaudited data does not confer Section 11 liability on E & Y.

for fiscal year 1998 were falsely certified so as to increase the scope of E & Y's Section 11 liability for the MRS.

In summary, the plaintiffs fail to provide any allegations supporting E & Y's Section 11 liability for the MRS beyond the 6/30/99 AOL Opinion. Accordingly, E & Y's motion is granted on this basis and its Section 11 liability for the MRS is limited to the 6/30/99 AOL Opinion.

**E. The 1934 Act Claims Are Dismissed in Part**

Finally, E & Y seeks to dismiss certain portions of the plaintiffs' 1934 Act claims for failure to allege scienter and loss causation. Relying on the Court's previous ruling that "the only E & Y audit report that is actionable under Section 14(a) is the 6/30/99 AOL Opinion," In re AOL Time Warner I, 381 F. Supp. 2d at 242, E & Y argues that the Section 14(a) claims should be dismissed in their entirety because the plaintiffs have failed to allege that "E & Y acted with the requisite state of mind in issuing" the 6/30/99 AOL Opinion (E & Y Br. 14) and that the plaintiffs' losses resulted from alleged misrepresentations in that report (E & Y Br. 18). For the same reasons, E & Y argues that the Section 10 claims should be dismissed to the extent that they are based on E & Y's 6/30/99 AOL Opinion. (E & Y Br. 23.) Further, E & Y argues that the Section 10 claims should be dismissed to the extent they seek to

recover for losses "sustained prior to publication of the Washington Post articles on July 18-19, 2002." (E & Y Br. 24.)

**1. Scienter**

The Court addressed E & Y's scienter in the context of the class action litigation, concluding that "red flag" allegations combined with "the centrality of advertising revenue to AOL and AOLTW's earnings targets" and allegations of "numerous GAAS and GAAP violations [are] sufficient to support an inference of scienter." In re AOL Time Warner I, 381 F. Supp. 2d at 240. Although the Court did not parse E & Y's scienter with respect to each of the allegedly misleading audit reports, the Court preceded its discussion of E & Y's scienter with an observation that the 6/30/99 AOL Opinion formed a valid basis for E & Y's alleged Section 10 liability. Furthermore, the plaintiffs here point specifically to two transactions during fiscal year 1999 (Compl. ¶ 258(f) & (h)) of a like kind to the Veritas transaction referenced by the Court's earlier Opinion, see In re AOl Time Warner I, 381 F. Supp. 2d at 240, in addition to more general allegations of GAAS and GAAP violations. Thus, as in the class action litigation, the Court finds that E & Y's scienter has been adequately alleged with respect to the 6/30/99 AOL Opinion. As the allegations here are likewise sufficient to allege scienter with respect to E & Y's Section 14 liability, the Court does not consider whether allegations of scienter are

required to state a claim for an auditor's liability under that
section.

### 2. Loss Causation

E & Y argues that the plaintiffs have failed to allege loss
causation with respect to the 6/30/99 AOL Opinion and, more
generally, for any investment losses incurred prior to July 18,
2002. Although the Court generally concluded that the class
action plaintiffs had adequately pleaded loss causation, see id.
at 231-32, the Court did not consider the sufficiency of loss
causation allegations with respect to E & Y. Therefore, the
Court now examines in the first instance allegations that E &
Y's audit opinions caused the plaintiffs' losses. Cf. Lattanzio,
476 F.3d at 157 (considering whether an auditor caused a
plaintiff's loss separately from the question of whether an
issuer caused the loss).

Both the Supreme Court and the Second Circuit have recently
reviewed the standard for pleading and proving loss causation.
In Dura Pharmaceuticals, Inc. v. Broudo, the Supreme Court
considered whether a plaintiff could adequately establish loss
causation merely by alleging that a defendant's
misrepresentations inflated a security's price on the date of
the plaintiff's purchase. 544 U.S. 336, 338 (2005). The Court
recognized that "the logical link between the inflated share

purchase price and any later economic loss is not invariably strong," because a lower share price at the time of sale

> may reflect, not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price. . . . Other things being equal, the longer the time between the purchase and sale, the more likely that this is so, *i.e.*, the more likely that other factors caused the loss.

Id. at 342-43. Because, normally, in fraud-on-the-market cases, "an inflated purchase price will not itself constitute or proximately cause the relevant economic loss," id. at 342, the Court concluded that the "failure to claim that Dura's share price fell significantly *after the truth became known*" precluded a finding that the plaintiff had pleaded loss causation. Id. at 347 (emphasis added).

While Dura addresses allegations that are insufficient to prove and plead loss causation, the Second Circuit, in Lentell v. Merrill Lynch & Co., provides a more detailed account of the type of allegations that will suffice to plead that element. 396 F.3d 161, 172-77 (2d Cir. 2005).[9] In that decision, the court

---

[9] Lentell was decided three months before the decision in Dura issued. Nevertheless, the Supreme Court favorably cited the Second Circuit's loss causation jurisprudence in opposition to the Ninth Circuit standard, which it rejected in Dura; thus, "Dura did not disturb Second Circuit precedent regarding loss causation." In re Initial Public Offering Sec. Litig., 399 F. Supp. 2d 298, 301 (S.D.N.Y. 2005). In addition, the Second Circuit recently confirmed, and expanded upon, Lentell's loss

explained that loss causation requires a plaintiff to allege not only that its loss was foreseeable, but also that the alleged "misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." Lentell, 396 F.3d at 173. In its simplest form, this may be achieved by alleging that the market reacted negatively to a "corrective disclosure," which revealed an alleged misstatement's falsity or disclosed that allegedly material information had been omitted. Id. at 175. Loss causation may also be pleaded by allegations that a defendant's misstatements or omissions concealed a risk that later materialized to cause the plaintiff's loss. Id. at 173, 176.

The indistinct nature of the loss causation allegations here complicates the question of whether the plaintiffs sufficiently allege that E & Y's audit opinions caused their investment losses. The plaintiffs allege that, "[a]s a direct result of public revelations regarding the truth about AOLTW's previously claimed merger synergies and its subscriber, backlog, financial results and its actual advertising prospects going forward, AOLTW's stock price plummeted" from the time of the merger in January 2001 until July 2002. (Compl. ¶ 330.) Thus, although E & Y may only be held liable under Section 10(b) for

causation analysis nearly two years after Dura. See Lattanzio, 476 F.3d at 157-58.

false audit opinions certifying AOL and AOLTW's financial results, see Lattanzio, 476 F.3d at 154-56, the plaintiffs predicate their losses on revelations regarding numerous factors beyond the scope of E & Y's liability, including representations about purported merger synergies and future prospects, and reports about subscriber numbers and advertising backlogs. The Court must wade though the plaintiffs' intertwined allegations to determine whether they have adequately alleged loss causation with respect to the 6/30/99 AOL Opinion or, more generally, whether they have sufficiently pleaded E & Y's liability for any losses sustained prior to July 18, 2002.

The plaintiffs do not allege that the 6/30/99 AOL Opinion was ever the subject of a corrective disclosure. In fact, the plaintiffs do not allege that the financial results certified by that Opinion were ever restated, or that the truth of that Opinion was called into question at any time during the AOLTW stock decline that caused their losses. Nor do the plaintiffs allege that the two allegedly fraudulent transactions entered into during that period were either corrected or brought to the market's attention prior to the stock's bottoming out at the end of July 2002. In short, the plaintiffs have not alleged that the market reacted negatively to the revelation of the 6/30/99 AOL Opinion's alleged falsity.

Furthermore, the plaintiffs cannot connect any of their losses to E & Y on a materialization of the risk theory, whether those losses purportedly arose out of the 6/30/99 AOL Opinion or out of any other allegedly false audit opinions. In each of the cases in which the Second Circuit has employed a materialization of the risk analysis, it has considered a particular risk that was allegedly concealed by the defendant's actions and which then materialized to cause a market loss. See Lattanzio, 476 F.3d at 157-58 (risk of impending bankruptcy was not concealed by audit opinion); Lentell, 396 F.3d at 177 (risk of stock volatility was not concealed by "buy" and "accumulate" recommendations); Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc., 343 F.3d 189, 197-98 (2d Cir. 2003) (risk of defendants' "dumping" their own shares of company stock was concealed by failure to reveal previous "pump and dump" schemes by the defendants); Suez Equity Investors, L.P. v. Toronto-Dominion Bank, 250 F.3d 87, 97-98 (2d Cir. 2001) (risk of liquidity crisis was concealed by edited background report omitting important negative events in executive's financial and business history); see also In re Initial Public Offering Sec. Litig. ("In re IPO II"), 399 F. Supp. 2d 298, 308-09 (S.D.N.Y. 2005) (risk that a complicated scheme misled the public as to the true value of securities failed to materialize to cause the plaintiffs' losses). Without providing some indication of the

nature of the risk alleged, bare allegations that an undisclosed risk materialized to cause a plaintiff's loss are insufficient. Here, the plaintiffs do not adequately identify what risk was concealed by the allegedly false audit opinions, nor does the Court's scrutiny of the Complaint reveal the materialization of any risk that would be sufficient to plead loss causation.

The plaintiffs come closest to addressing the materialization of the risk theory by alleging that a "truer picture of the Company's operation reached the market" in July 2001 when an article in _Fortune_ magazine questioned certain advertising deals and AOLTW released lower-than-projected advertising revenues. (Compl. ¶ 327.) But the Court cannot conceive of what risk could possibly have materialized when an article, while questioning "what critics consider some controversial sales tactics and accounting games," asserted that "AOL thrives," and that AOLTW's accounting was "perfectly legal" and "mandated by GAAP rules." Jeremy Kahn, _Do AOL's Ads Add Up?_, _Fortune_, July 23, 2001, at 94. Furthermore, it is not enough to argue that E & Y's audit opinions concealed the risk that AOLTW would be unable to meet future revenue projections, because the mere failure to meet earnings forecasts is insufficient to establish loss causation. See In re IPO II, 399 F. Supp. 2d at 309; In re Initial Public Offering Sec. Litig. ("In re IPO I"), 399 F. Supp. 2d 261, 266-67 (S.D.N.Y. 2005) ("If downturns in

stock prices based on such mundane events as failures to meet forecasts and downward revisions of forecasts were legally sufficient to constitute disclosures of securities fraud, then any investor who loses money in the stock market could sue to recover for those losses without alleging that a fraudulent scheme was ever disclosed and that the disclosure caused their losses."). After searching the Complaint and the plaintiffs' opposition brief, the Court cannot perceive any risk concealed by E & Y's audit opinions that then materialized to cause the plaintiffs' losses.

Without providing a nexus between the alleged fraud and their losses, either by demonstrating the materialization of a concealed risk or the existence of a corrective disclosure, the plaintiffs fail to plead loss causation with respect to the 6/30/99 AOL Opinion. Thus, the Section 14 claim is dismissed in its entirety, and the Section 10 claim is dismissed to the extent it is based on the 6/30/99 AOL Opinion.

Moreover, the plaintiffs' allegations do not establish a nexus between any of E & Y's audit opinions and investment losses prior to July 18, 2002. As discussed above, the plaintiffs have failed to indicate any risk concealed by E & Y's allegedly fraudulent audit opinions that then materialized to cause their losses. Furthermore, the first corrective disclosure bearing upon allegations of fraudulent accounting entered the

market on July 18, 2002, when the Washington Post published the first of two articles documenting the alleged fraud. See In re AOL Time Warner I, 381 F. Supp. 2d at 211 (establishing that the class's duty to inquire was triggered by the publication of the Washington Post articles); cf. Lentell, 396 F.3d at 175 n.4 (stating that plaintiffs may not argue that they lacked knowledge of a fraud in order to "withstand the statute of limitations" yet argue that the fraud was disclosed for purposes of loss causation prior to the date that they allege they were put on inquiry notice). Prior to that date, even those purported "partial disclosures" (Pls.' Opp'n to E & Y 27) that touch upon AOL and AOLTW's accounting are insufficient as a matter of law to plead loss causation.

For instance, the Fortune article cited by the plaintiffs, which first entered the market on July 11, 2001, did not disclose the existence of fraudulent accounting, let alone the likelihood that E & Y falsely certified AOL and AOLTW's year-end financial results. Nor does a passing reference to AOL's free cash flow in the first quarter of 2001 suffice to plead loss causation with respect to any of E & Y's audit opinions. Pallavi Gogoi, *Making Bad News Pay*, BusinessWeek, Sept. 3, 2001, at EB24. Similarly insufficient to disclose the falsity of E & Y's audit opinions are an analyst's contention that AOL and AOLTW "had aggressive accounting," Seth Sutel, *New AOL Boss Comes*

*Clean With Investors*, Associated Press, Jan. 14, 2002, articles
speculating that past stock declines were "spurred by concerns
about the company's accounting," Aimee Picchi, *AOL Time Warner's
Levin Changes Course on Forecasts*, Bloomberg News, Jan. 30,
2002; accord Dan Cox, *Ticking Time Bomb - Street Buzzing About
AOL's Accounting*, N.Y. Post, Apr. 11, 2002, at 35, or reference
to a single AOL deal in an article noting regulatory interest in
barter transactions, Matt Krantz, *Regulators Look Closely at
Bartering*, USA Today, May 21, 2002, at 3B. Ultimately, while
each of these alleged "partial disclosures," which comprise a
handful of third-party comments plucked from over a year's worth
of news, notes some concern about AOL or AOLTW's accounting,
none of them "amount to a corrective disclosure . . . because
they do not reveal to the market the falsity of the prior" E & Y
audit opinions. Lentell, 396 F.3d at 175 n.4.

Finally, even assuming that the plaintiffs' allegations
were sufficient to connect E & Y's audit opinions to stock
declines prior to the Washington Post articles, they "have not
alleged facts to show that [E & Y]'s misstatements among others
(made by [AOL and AOLTW]) that were much more consequential and
numerous, were the proximate cause of plaintiffs' loss; nor have
they alleged facts that would allow a factfinder to ascribe some
rough proportion of the whole loss to [E & Y]'s misstatements."
Lattanzio, 476 F.3d at 158 (citing Lentell, 396 F.3d at 177);

accord In re IPO II, 399 F. Supp. 2d at 309 (citing Lentell, 396
F.3d at 177). Accordingly, the plaintiffs' Section 10 claims are
dismissed to the extent that they seek losses incurred prior to
July 18, 2002.

## III.  CONCLUSION

In  summary,  E  &  Y's  motion  to  dismiss  is  granted  as
follows: the state law claims are dismissed under SLUSA; claims
based  on  pre-merger  AOL  shares  are  dismissed  for  failure  to
plead  a  material  misstatement;  the  control  person  claims  are
dismissed  for  failure  to  plead  E  &  Y's  control  over  a  primary
violator;  the  Section  11  claim  based  on  the  MRS  is  dismissed
insofar as it is premised on anything other than E & Y's 6/30/99
AOL  Opinion;  the  Section  14  claim  is  dismissed  for  failure  to
plead  loss  causation;  and  the  Section  10  claim  is  partially
dismissed  for  failure  to  plead  loss  causation  with  respect  to
the  6/30/99  AOL  Opinion  and  to  the  extent  that  the  plaintiffs
seek to recover for losses sustained prior to July 18, 2002.

Furthermore,  in  light  of  the  reasoning  of  this  Opinion  and
the  voluntary  dismissal  of  the  AOLTW  Defendants  from  this
litigation,  the  Court  denies  the  plaintiffs'  pending  motion  to
amend the Complaint. See 06 Civ. 0695 (SWK), Dkt. No. 87. If the
plaintiffs seek to renew their motion to amend as to E & Y, they
are  directed  to  inform  the  Court  of  their  intention  and  explain

the basis of their motion, in compliance with the Court's Rules
for Attorneys, by July 6, 2007.

SO ORDERED.

_____

SHIRLEY WOHL KRAM
UNITED STATES DISTRICT JUDGE

Dated:    New York, New York
          June 20, 2007

29